1

2

3

4

5

6

7

8             IN THE UNITED STATES DISTRICT COURT

9           FOR THE EASTERN DISTRICT OF CALIFORNIA

10   PAUL E. HYDE,

11            Petitioner,                    No. CIV S-09-3240-FCD-TJB

12        vs.

13   STEVE MOORE,

14            Respondent.              FINDINGS AND RECOMMENDATIONS

15   _____/

16                      I.  INTRODUCTION

17        Petitioner Paul E. Hyde is a state prisoner proceeding pro se with a petition for writ of

18   habeas corpus pursuant to 28 U.S.C. § 2254.  For the following reasons, it is recommended that

19   habeas relief be denied.

20                   II.  PROCEDURAL HISTORY

21        Petitioner is currently serving a sentence of seven years to life.  Pet'r's Pet. 1, ECF No.

22   1;[1] *see also Hyde v. Moore*, No. CIV S-08-1365-FCD-TJB, 2010 WL 4321606, at *1 (E.D. Cal.

23   _____

24        [1] The Case Management/Electronic Case Files (CM/ECF) docketing and file system is
     implemented, which allows the parties to electronically file pleadings and documents.  For
25   pleadings or documents submitted in paper format, the filing is scanned and stored electronically
     into the CM/ECF system, except for lodged documents.  Each page of the electronic filing is
26   numbered chronologically, whether or not the party numbered it.  If the filing is lengthy, the

                               1

1  Oct. 26, 2010).  "In 1973, at age 19, in the Los Angeles County Superior Court [C]ase No.

2  A068239, [Petitioner] was convicted of first degree murder (§ 187; count 5), four counts of

3  robbery of the first degree (§ 211; counts 1, 2, 6 & 7), assault with a deadly weapon with the

4  intent to commit murder (former § 217; count 3), and assault by means of force likely to produce

5  great bodily injury and with a deadly weapon (§ 245, subd. (a)(1); count 4), each with the

6  personal use of a firearm (§ 12022.5)."  *Hyde*, 2010 WL 4321606, at *1 (quoting *In re Hyde*, 154

7  Cal. App. 4th 1200, 1202, 65 Cal. Rptr. 3d 162 (2007)) (internal quotation marks omitted).  In

8  the instant action, Petitioner challenges the decision by the California Board of Parole Hearings

9  (the "Board") denying Petitioner parole.  Petitioner appeared before the Board on April 19, 2007.

10      Dated August 16, 2007, Petitioner's petition for writ of habeas corpus was filed in the

11  Los Angeles County Superior Court challenging the Board's decision.[2]  *See* Resp't's Answer Ex.

12  1, ECF No. 10.  In a decision dated October 29, 2007, the Superior Court issued a reasoned

13  decision denying parole.  *See* Resp't's Answer Ex. 2.

14      On April 8, 2008, Petitioner sought relief in the California Court of Appeal, Second

15  Appellate District.  *See* Resp't's Answer Ex. 3.  On May 8, 2008, the California Court of Appeal

16  denied the petition without comment or citation.  *See* Resp't's Answer Ex. 4.

17      On June 9, 2008, Petitioner sought relief in the California Supreme Court.  *See* Resp't's

18  Answer Ex. 5.  On December 17, 2008, the California Supreme Court denied the petition with

19  only a citation to *People v. Duvall*, 9 Cal. 4th 464, 474, 37 Cal. Rptr. 2d 259, 886 P.2d 1252

20  (1995).  *See* Resp't's Ex. 6.

21      On November 20, 2009, Petitioner filed the instant federal petition for writ of habeas

22

_____

23  document is divided into parts.  Here, when a page number for a filed pleading or document is

24  cited, the CM/ECF page number is used when available, which may not coincide with the page
number that the parties used.

25    [2] The Superior Court's decision states Petitioner filed his state habeas petition on July 20,
2007, *see* Resp't's Answer Ex. 2, at 2, but the record in the instant case does not reflect that date.

26  *See* Resp't's Answer Ex. 1.

1  corpus.  *See* Pet'r's Pet.  Respondent filed an answer to the petition on October 22, 2010, *see*

2  Resp't's Answer, to which Petitioner filed a traverse on November 2, 2010.  *See* Pet'r's Traverse,

3  ECF No. 11.

### III.  FACTUAL BACKGROUND

A.  Commitment Offense[3]

> The record reflects that on December 7, 1972, . . . Petitioner robbed William and Maureen Wilson at gunpoint at their bicycle shop.  After taking the money from Mr. Wilson's wallet, . . . Petitioner directed both victims into the bathroom and told them that if they did not wait five minutes before coming out, he would kill them.  On December 9, 1972, . . . Petitioner robbed Leandra Lack, an attendant at a service station. . . . Petitioner ordered Ms. Lack to open a cash box and took the money from it.  He then directed Ms. Lack to face the wall.  As Ms. Lack tried to comply with . . . Petitioner's orders, he shot her twice, hitting her once in her back and once in her leg.  On January 8, 1973, . . . Petitioner shot and killed Rueben Holtzkener in a suspected armed robbery at Mr. Holtzkener's shoe repair store.  Mr. Holtzkener was shot once in the chest and once in the abdomen and it appeared that money was missing from the opened cash drawer.  On January 9, 1973, . . . Petitioner and an accomplice robbed Juan Nieves and Jenny Charr at gunpoint at a fast food restaurant.  He stole money from the cash register and fled.  Finally, on January 10, 1973, . . . Petitioner robbed Larry Mendez at gunpoint at an ice cream shop and stole money from that cash register.  Subsequent ballistics tests matched the bullets found in Ms. Lack and Mr. Holtzkener to a gun found in . . . Petitioner's apartment and witnesses identified . . . Petitioner as the person who committed the other robberies.

18  Resp't's Answer Ex. 2, at 3.

B.  April 19, 2007, Parole Hearing

20  On April 19, 2007, the Board held Petitioner's "21st subsequent parole hearing."  Pet'r's

21  Pet. Ex. K, pt. 2, at 6.  For at least the past twenty years, Petitioner had the same attorney

22  representing him at parole hearings.  *Id.*  However, at the April 19, 2007, parole hearing,

---

[3] These facts are from the Superior Court's opinion issued on October 29, 2007.  *See* Resp't's Answer Ex. 2, at 3.  Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996, a determination of fact by the state court is presumed to be correct unless Petitioner rebuts that presumption with clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *see Moses v. Payne,* 555 F.3d 742, 746 n.1 (9th Cir. 2009); *Davis v. Woodford,* 384 F.3d 628, 638 (9th Cir. 2004).

3

1    Petitioner had a new attorney because the previous one was "deceased," having been "murdered

2    in his driveway [on] January 29th, [2007,] . . . ."  *Id.*  Petitioner was "nervous" because previous

3    counsel "knew how [he] got to the place [he is] at now," and if Petitioner "missed something,"

4    previous counsel "knew how to fill it in."  *Id.* at 7.

5         During the hearing, the Board added that "just for clarification," it "incorporate[d] by

6    reference" the January 3, 2007, Superior Court decision by the Honorable Steven R. Van Sicklen,

7    which granted Petitioner habeas relief.  *Id.* at 121; *see* Pet'r's Pet. Ex. A, pt. 1, at 27-28; *see also*

8    *Hyde*, 2010 WL 4321606, at *1.  In the January 3, 2007, decision, the Superior Court

9    "remand[ed] the order to the Board to reconsider its decision and to conduct a new hearing

10   within 45 days of service of this order to reconsider [Petitioner's] suitability for parole . . . ."

11   Pet'r's Pet. Ex. A, pt. 1, at 28.  At the April 19, 2007, hearing, the Board stated "a writ of habeas

12   corpus is the reason that brings us all here today."  Pet'r's Pet. Ex. K, pt. 1, at 121.

13        At the hearing, the Board discussed Petitioner's background.  *Id.* at 91.  Petitioner is the

14   "third of six children."  *Id.* at 110.  Petitioner was "born in Los Angeles, raised by both parents,"

15   and is "the only person in [his family] to have been arrested."  *Id.*  Petitioner "complete[d] the

16   12th grade, but did not receive a diploma because [he] w[as] a few units short for graduation . . .

17   ."  *Id.*  For the last five months of high school, Petitioner "lived with [his] maternal grandmother

18   in Los Angeles."  *Id.*  Petitioner's mother stated "she sent [Petitioner] there for [his] own safety"

19   because Petitioner claimed he witnessed an arrest and "purported beating by police officers by a

20   youngster who later hung himself in jail."  *Id.*  Petitioner also alleged "he was picked up by

21   police, beaten and threatened to keep his mouth shut," but a "polygraph . . . showed deception."

22   *Id.*  Petitioner "worked part-time and full-time during the summer," and did "various odds and

23   ends sorts of jobs."  *Id.*  Petitioner "notes his family has always been close and supportive.  He

24   continues to receive frequent family visits, phone calls or letters.  He reports none of his

25   immediate family have substance abuse problems, major mental health problems or a criminal

26   record."  Pet'r's Pet. Ex. G, pt. 1, at 48.  Petitioner also has no history of drug or alcohol abuse,

Pet'r's Pet. Ex. K, pt. 1, at 112-13, and no history of juvenile convictions.  Pet'r's Pet. Ex. G, pt. 1, at 50.

At the time of the commitment offense, Petitioner was unmarried.  Petitioner has been married twice since his incarceration.  Pet'r's Pet. Ex. K, pt. 1, at 112.  "The first marriage was in 1977 and divorced in 1982," with "[n]o children from that marriage."  *Id.*  Petitioner was married again in 1983, and had one child from that marriage, who was twenty-eight years old at the time of the hearing.  *Id.*

Petitioner performed well in prison.  *See*, *e.g.*, Pet'r's Pet. Ex. G, pt. 1, at 48-50; *see also*, *e.g.*, Pet'r's Pet. Ex. K, pt. 1, at 127-31.  Petitioner "has a lengthy documented history of participation in educational and self-improvement activities."  Pet'r's Pet. Ex. G, pt. 1, at 49; *see* Pet'r's Pet. Ex. K, pt. 1, at 129-30.  In 1974, Petitioner received his high school diploma while incarcerated, and "[s]ince then, he has taken many college courses."  Pet'r's Pet. Ex. G, pt. 1, at 48.  Petitioner had "exceptional work skills,"  Pet'r's Pet. Ex. K, pt. 1, at 134, and "consistently received above average to exceptional job ratings by his supervisors."  Pet'r's Pet. Ex. G, pt. 1, at 50.  Petitioner was "confident" he could "obtain employment in the computer field, and that [he] possess[ed] [p]lumbing, [e]lectronics, [g]lazing, [and] [p]ainting skills."  Pet'r's Pet. Ex. K, pt. 1, at 133.  At the time of the hearing, Petitioner "had several offers [of employment] last year, which still remain[ed] available."  *Id.*

After the Deputy District Attorney presented his closing arguments, the Board denied Petitioner parole for a period of one year.  The Board explained:

> **PRESIDING COMMISSIONER DAVIS**: Okay.  Without question, [Petitioner], the [Board] . . . takes nothing away from the work that you've done since 1991, that clearly you have amassed many, many positive things.  However, these positive aspects of behavior do not outweigh the factors for unsuitability.  This is a one-year denial.  The [Board] will recommend that you remain disciplinary free, that . . . you continue to participate in self-help, that you participate in independent reading, which you clearly are doing already, and we would [re]commend to you that . . . the [Board] will accept short reports, two or three paragraphs indicating an understanding of what you have read, what effect it

5

1   has on you in terms of your particular situation.  *For example, in
    your case, maybe a greater understanding of what the specific*
2   *triggers were that led to this situation, and that you can review the*
    *record itself and perhaps, if for no one else other than yourself,*
3   *come to an understanding of what occurred and more . . .*
    *importantly[,] why it occurred.*  And the [Board] will be requesting
4   a new psychological evaluation to be prepared under our new
    format prior to the next hearing.  And Commissioner, you had
5   some things you wanted to add.

6   **DEPUTY COMMISSIONER WEAVER**:  Yes. I would suggest
    to you, [Petitioner], that when you have a chance for an Olsen
7   review, that you look through all the documents in your files even
    though they're voluminous[.] . . . I believe there are four files, and
8   that you take the time to ensure that the documents that are in there
    are correct and accurate.  I also think in preparation for the next
9   hearing -- and I know you're capable of keeping good records by
    evidence of the folders that you have presented, I would also
10  recommend and the [Board] would recommend that you *look at the*
    *psych reports* and the Board reports and *make a record of*
11  *discrepancies and things that you wish to have clarified once and*
    *for all so that the [Boards] have a better understanding when and*
12  *if you told less than the truth and when you did tell the truth so that*
    *there's an accurate record of what occurred* or what you believe
13  occurred.  That's all I have.

14  **PRESIDING COMMISSIONER DAVIS**:  All right.  Thank you.
    All right.  [Petitioner], we do wish you the best of luck.  And we
15  are adjourned.

16  Pet'r's Pet. Ex. K, pt. 2, at 52-54 (emphasis added).

17       C.  State Court Decision

18       On October 29, 2007, the Superior Court found that some evidence supported the Board's

19  decision and denied Petitioner's habeas petition, stating, in relevant part:

20       Petitioner challenges the Board's April 19, 2007 decision denying
         parole. . . . Petitioner was denied parole for one year.  The Board
21       concluded that . . . Petitioner was unsuitable for parole and would
         pose an unreasonable risk of danger to society and a threat to
22       public safety.  The Board based its decision on several factors,
         including his commitment offenses and his early institutional
23       behavior.

24       The Court finds that there is some evidence to support the Board's
         finding that there were multiple victims who were attacked,
25       injured, or killed during the offense.  Cal. Code Regs., tit. 15, §
         2281, subd. (c)(1)(A).  Seven total victims were attacked and made
26       to fear for their lives, as . . . Petitioner robbed them at gunpoint.

6

Ms. Lack was seriously injured when . . . Petitioner shot her twice, hitting her in the back and leg.  Additionally, . . . Petitioner shot Mr. Holtzkener to death, with one fatal shot to the chest and one shot to the abdomen.

The Court also finds that there is some evidence to support the Board's findings that the commitment offenses were carried out in a dispassionate and calculated manner and that the Petitioner's motive was very trivial in relation to the offenses.  Cal. Code Regs., tit. 15, § 2281, subds. (c)(1)(D)[4] and (c)(1)(E). . . . Petitioner armed himself with a gun and went to each place of business with the predetermined intent of robbing the clerks or attendants at gunpoint.  In each instance, he stole money from either the victim's wallet, or from the cash drawer or register at the store.  Even after the shooting of Ms. Lack and the tragic death of Mr. Hotzkener, . . . Petitioner planned and committed an additional two robberies.  These actions were planned, deliberate, dispassionate and calculated.  Additionally, . . . Petitioner's motive of obtaining the amount of rent his pay would not cover is extremely trivial in relation to robbing seven individuals at gunpoint, shooting and seriously injuring one victim, and shooting another victim to death.

Additionally, the Court finds that there is some evidence to support the Board's finding that . . . Petitioner's institutional behavior supports a finding of unsuitability.  Cal. Code. Regs., tit. 15, § 2281, subd. (c)(6).  Although . . . Petitioner has commendably avoided any serious discipline for 16 years, he had several serious 115 violations early in his incarceration. . . . Petitioner received a total of 14 serious 115s including one for inciting violence, one for fighting, and on[e] for possessing an inmate manufactured weapon, for which he also received a conviction.

The Board also considered the 2005 psychological report's assessment that . . . Petitioner struggles to acknowledge his faults.  While this factor may not justify a finding of unsuitability, the Board may properly consider it as a relevant determination of whether . . . Petitioner is suitable for parole.  Cal. Code. Regs., tit. 15, § 2281(b).  Additionally, the Board considered the opposition from the District Attorney.  Although the District Attorney's opposition to Petitioner's release is not a factor on which the Board may rely to deny parole, the Board is required to consider such opposition.  Cal. Penal Code § 3402.  The Board's consideration of the District Attorney's concerns was not improper and was not the basis for denying parole.

---

[4] The Superior Court probably meant to cite section 2281(c)(1)(B), which states:  "The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder."  In contrast, section 2281(c)(1)(D) states:  "The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering."

> The Board also considered . . . Petitioner's post-conviction gains, including his ability to remain discipline-free for 16 years; his participation in many self-help programs; the programs that he initiated while incarcerated, such as the victim awareness program, conflict resolution, and a walk-a-thon for breast-cancer; the high school diploma and college credits he earned; his exceptional work reports and many vocational skills he learned; as well as the many positive chronos he earned.  However, they still concluded that . . . Petitioner would pose an unreasonable threat to public safety. Penal Code § 3041(b).

> In light of the recent Court of Appeal decisions, the Court finds that there is some evidence to support the Board's determination that because of the nature of his commitment offense and the behavioral problems early in his incarceration.  While the commitment offense occurred over 34 years ago and the serious disciplines all occurred over 16 years ago, these factors constitute the "modicum of evidence" necessary to support a Board's decision to deny parole.  As indicated in [*In re*] *Rosenkrantz*, . . . [(2002)] 29 Cal.4th [616,] 677, [128 Cal. Rptr. 2d 104, 59 P.3d 174,] it is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence that demonstrates unsuitability for parole, as long as there is some evidence to support the finding of unsuitability.  See, *In re Jacobson* (2007) 154 Cal.App.4th 849, 860[,] [65 Cal. Rptr. 3d 222]; and [*In re*] *Hyde*, [(2007)] 154 Cal.App.4th [1200,] 1213[,] [65 Cal. Rptr. 3d 162].

> . . . Petitioner's remaining arguments that the Board failed to comply with the Court's January 3, 2007 order are without merit. The Board conducted a full hearing in compliance with the order and, as discussed above, the Board's decision is supported by some evidence.

Resp't's Answer Ex. 2, at 3-5.

## IV.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

An application for writ of habeas corpus by a person in custody under judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing *Engle v. Isaac*, 456 U.S. 107, 119 (1982)).  This petition for writ of habeas corpus was filed after the effective date of, and thus is subject to, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359, 362 (9th Cir. 1999).  Under

1   AEDPA, federal habeas corpus relief also is not available for any claim decided on the merits in

2   state court proceedings unless the state court's adjudication of the claim:

3              (1) resulted in a decision that was contrary to, or involved an
               unreasonable application of, clearly established Federal law, as
4              determined by the Supreme Court of the United States; or

5              (2) resulted in a decision that was based on an unreasonable
               determination of the facts in light of the evidence presented in the
6              State court proceeding.

7   28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v.*

8   *Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).

9              In applying AEDPA's standards, the federal court must "identify the state court decision

10  that is appropriate for our review." *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005).

11  "The relevant state court determination for purposes of AEDPA review is the last reasoned state

12  court decision." *Delgadillo v. Woodford*, 527 F.3d 919, 925 (9th Cir. 2008) (citations omitted).

13  "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained

14  orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v.*

15  *Nunnemaker*, 501 U.S. 797, 803 (1991).  To the extent no such reasoned opinion exists, courts

16  must conduct an independent review of the record to determine whether the state court clearly

17  erred in its application of controlling federal law, and whether the state court's decision was

18  objectively unreasonable.  *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000).  "The

19  question under AEDPA is not whether a federal court believes the state court's determination

20  was incorrect but whether that determination was unreasonable--a substantially higher

21  threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410).

22  "When it is clear, however, that the state court has not decided an issue, we review that question

23  *de novo*." *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006) (citing *Rompilla v. Beard*,

24  545 U.S. 374, 377 (2005)).

25                                  V.  CLAIMS FOR REVIEW

26             The petition for writ of habeas corpus sets forth four grounds for relief, which are

9

1    identical to the grounds discussed in the previous findings and recommendations. *Hyde*, 2010

2    WL 4321606, at *10.  First, Petitioner argues that the Board erred because of "continued reliance

3    on the commitment offense which will never change." Pet'r's Pet. pt. 1, at 6.  Second, Petitioner

4    asserts he is entitled to parole because he served "beyond the maximum time contained in the

5    matrix." *Id.*  Third, Petitioner claims his due process rights were violated at the parole hearing.

6    *Id.*  Fourth, Petitioner alleges there is "no evidence of current risk." *Id.*  For the following

7    reasons, Petitioner's allegations lack merit.

8        A.  Procedural Default and Exhaustion

9        The California Supreme Court denied Petitioner's state habeas petition on procedural

10   grounds, with only a citation to *People v. Duvall*, 9 Cal. 4th 464, 474, 37 Cal. Rptr. 2d 259, 886

11   P.2d 1252 (1995).  *See* Resp't's Answer Ex. 6.  Arguably, Petitioner may have procedurally

12   defaulted his entire petition.  However, Respondent only contends Petitioner failed to exhaust his

13   matrix argument in state court.  Specifically, "Respondent admits that Petitioner exhausted his

14   state court remedies on his some evidence claim, and denies that Petitioner exhausted his state

15   court remedies to the extent they are interpreted more broadly to include systematic issues

16   beyond the 2007 parole hearing."  Resp't's Answer 2.  Since Petitioner argues his due process

17   rights were also violated because his imprisonment "exceed[s] the maximum time contained in

18   the matrix," Pet'r's Pet. pt. 1, at 15, Respondent implies only that Petitioner failed to exhaust this

19   claim.

20        1.  Legal Standard for Procedural Default and Exhaustion

21        "Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available

22   state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the 'opportunity to pass upon

23   and correct' alleged violations of prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29

24   (2004) (quoting *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (per curiam)); *see Rose v. Lundy*,

25   455 U.S. 509, 522 (1982) ("[W]e hold that a district court must dismiss habeas petitions

26   containing both unexhausted and exhausted claims.").  "The state courts have been given a

1  sufficient opportunity to hear an issue when the petitioner has presented the state court with the

2  issue's factual and legal basis." *Weaver v. Thompson*, 197 F.3d 359, 364 (9th Cir. 1999) (citing

3  *Duncan*, 513 U.S. at 365 (legal basis); *Correll v. Stewart*, 137 F.3d 1404, 1411-12 (9th Cir.

4  1998) (factual basis)). "A petitioner has satisfied the exhaustion requirement if:  (1) he has

5  'fairly presented' his federal claim to the highest state court with jurisdiction to consider it[;] . . .

6  or (2) he demonstrates that no state remedy remains available." *Johnson v. Zenon*, 88 F.3d 828,

7  829 (9th Cir. 1996) (citations omitted).

8  Regardless of whether the claim was raised on direct appeal or in a post-conviction

9  proceeding, the exhaustion doctrine requires that each claim be fairly presented to the state's

10  highest court. *See Castille v. Peoples*, 489 U.S. 346, 351 (1989).  Although the exhaustion

11  doctrine requires only the presentation of each federal claim to the highest state court, the claims

12  must be presented in a posture that is acceptable under state procedural rules. *See Sweet v. Cupp*,

13  640 F.2d 233, 237-38 (9th Cir. 1981).  An appeal or petition for post-conviction relief that is

14  denied by the state courts on procedural grounds, where other state remedies are still available,

15  does not exhaust the petitioner's state remedies. *See Pitchess v. Davis*, 421 U.S. 482, 488

16  (1979); *Sweet*, 640 F.2d at 237-38.

17  A habeas petition is procedurally defaulted when the last reviewing state court dismissed

18  it for failure to comply with a state rule of procedure. *Trest v. Cain*, 522 U.S. 87, 88-90 (1997);

19  *Lambright v. Stewart,* 241 F.3d 1201, 1205 (9th Cir.2001).  When the procedural rule is

20  independent of federal law and adequate to support the judgment, federal review of the claims is

21  barred unless the petitioner can demonstrate either cause for the default and actual prejudice

22  resulting from the alleged constitutional violations, or that failure to consider the claims will

23  result in a fundamental miscarriage of justice. *Carter v. Giurbino*, 385 F.3d 1194, 1196-97 (9th

24  Cir. 2004) (citing *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)).  Procedural default is an

25  affirmative defense, and once the respondent has adequately pled the existence of independent

26  and adequate state procedural grounds, the burden to place that defense in issue shifts to the

1   petitioner.  *Bennett v. Mueller*, 322 F.3d 573, 586 (9th Cir. 2003).

2          2.  Analysis of Procedural Default

3        The last court to review Petitioner's claims was the California Supreme Court, which

4   issued a one sentence denial of the petition, citing *People v. Duvall*, 9 Cal. 4th 464, 474, 37 Cal.

5   Rptr. 2d 259, 886 P.2d 1252 (1995).  *See* Lodged Doc. 6.  Under California law, a citation to

6   *Duvall* indicates that a petitioner has failed to state his claim with sufficient particularity for the

7   state court to examine the merits of the claim, and/or has failed to "include copies of reasonably

8   available documentary evidence supporting the claim, including pertinent portions of trial

9   transcripts and affidavits or declarations."  *Duvall*, 9 Cal. 4th at 474, 37 Cal. Rptr. 2d 259, 886

10  P.2d 1252.  A failure to comply with this requirement is a pleading defect subject to cure by

11  amendment.

12       Here, Respondent has waived the affirmative defense of procedural default by failing to

13  raise it in the answer, and "[a] court . . . is not 'required' to raise the issue of procedural default

14  *sua sponte*."  *Trest*, 522 U.S. at 89; *see* Resp't's Answer 2 ("Respondent admits that Petitioner

15  exhausted his state court remedies on his some evidence claim, and denies that Petitioner

16  exhausted his state court remedies to the extent they are interpreted more broadly to include

17  systematic issues beyond the 2007 parole hearing.").  Rather, "a district court may raise the

18  defense of procedural default *sua sponte* if to do so serves the interests of justice, comity,

19  federalism, and judicial efficiency."  *Windham v. Merkle*, 163 F.3d 1092, 1100 (9th Cir. 1998)

20  (citation omitted).  In the instant case, Petitioner's state petition appears to satisfy the *Duvall*

21  pleading requirements, because it "both (i) states fully and with particularity the facts upon which

22  relief is sought . . . as well as (ii) includes copies of reasonably available documentary evidence

23  supporting the claim, including pertinent portions of trial transcripts and affidavits or

24  declarations."  *Duvall*, 9 Cal. 4th at 474, 37 Cal. Rptr. 2d 259, 886 P.2d 1252 (citations omitted).

25  Raising the issue of procedural default *sua sponte* here will not serve the interests of justice and

26  comity because the refusal by the California Supreme Court to consider the merits of Petitioner's

1   claims does not appear to be supported by the record, and because Respondent has waived the

2   affirmative defense of procedural default.

3            3.  Analysis of Exhaustion

4            Here, Petitioner raised the matrix argument in his state habeas petitions to the California

5   Court of Appeal and the California Supreme Court, but not in his state habeas petition to the

6   Superior Court.  *Compare* Resp't's Answer Ex. 3, at 13, 19 (California Court of Appeal), *and*

7   Resp't's Answer Ex. 5, pt. A, at 13 (California Supreme Court), *with* Resp't's Answer Ex. 1

8   (Superior Court).  "[T]he California Constitution provides that each of the three levels of state

9   courts -- Superior Courts, Courts of Appeal, and the Supreme Court -- has 'original jurisdiction

10  in habeas corpus proceedings.'"  *Gaston v. Palmer*, 387 F.3d 1004, 1010 (9th Cir. 2004) (quoting

11  Cal. Const. art. VI, § 10), *amended for other reasons by* 447 F.3d 1165 (9th Cir. 2006).  A

12  California prisoner may file an original habeas petition in each of the three courts, and each court

13  may exercise its original jurisdiction.  *See, e.g.*, *In re Clark*, 5 Cal. 4th 750, 760-62, 21 Cal. Rptr.

14  2d 509, 855 P.2d 729 (1993) (noting petitioner's first habeas application was filed in California

15  Supreme Court).  Since Petitioner presented the matrix argument to the California Supreme

16  Court, "the highest state court with jurisdiction to consider it," *Johnson*, 88 F.3d at 829, this

17  claim is exhausted.

18           Even if Petitioner's claim is unexhausted, an application for a writ of habeas corpus may

19  be denied on the merits, notwithstanding the applicant's failure to exhaust available state

20  remedies.  28 U.S.C. § 2254(b)(2).  A federal court considering a habeas petition may deny an

21  unexhausted claim on the merits when it is perfectly clear that the claim is not "colorable."

22  *Cassett v. Stewart*, 406 F.3d 614, 624 (9th Cir. 2005).  Here, Petitioner's matrix argument also

23  fails on the merits, and this matter is now ready for decision.  *See infra* Part V.C.2.

24           B.  Legal Standard for Parole Denial

25           The Due Process Clause of the Fourteenth Amendment prohibits state action that deprives

26  a person of life, liberty, or property without due process of law.  A person alleging a due process

13

1   violation must first demonstrate that he or she was deprived of a protected liberty or property

2   interest, and then show that the procedures attendant upon the deprivation were not

3   constitutionally sufficient.  *Ky. Dep't. of Corr. v. Thompson*, 490 U.S. 454, 459-60 (1989);

4   *McQuillion v. Duncan*, 306 F.3d 895, 900 (9th Cir. 2002).

5          1.  Liberty Interest in Parole

6        A protected liberty interest may arise from either the Due Process Clause itself or from

7   state laws.  *Bd. of Pardons v. Allen*, 482 U.S. 369, 373 (1987).  The United States Constitution

8   does not, in and of itself, create for prisoners a protected liberty interest in the receipt of a parole

9   date.  *Jago v. Van Curen*, 454 U.S. 14, 17-21 (1981).  The full panoply of rights afforded a

10   defendant in a criminal proceeding is not constitutionally mandated in the context of a parole

11   proceeding.  *See Pedro v. Or. Parole Bd.*, 825 F.2d 1396, 1398-99 (9th Cir. 1987).  The Supreme

12   Court has held that a parole board's procedures are constitutionally adequate if the inmate is

13   given an opportunity to be heard and a decision informing him of the reasons he did not qualify

14   for parole.  *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 16 (1979).  If a

15   state's statutory parole scheme uses mandatory language, however, it "'creates a presumption that

16   parole release will be granted' when or unless certain designated findings are made," thereby

17   giving rise to a constitutional liberty interest.  *McQuillion*, 306 F.3d at 901 (quoting *Greenholtz*,

18   442 U.S. at 12).

19        Section 3041 of the California Penal Code sets forth the state's legislative standards for

20   determining parole for life-sentenced prisoners.  Subsection (a) provides that "[o]ne year prior to

21   the inmate's minimum eligible parole release date a panel . . . shall again meet with the inmate

22   and shall normally set a parole release date . . . ."  Subsection (b) provides an exception to the

23   regular and early setting of a life-sentenced individual's term, if the Board determines "that the

24   gravity of the current convicted offense or offenses, or the timing and gravity of current or past

25   convicted offense or offenses, is such that consideration of the public safety requires a more

26   lengthy period of incarceration . . . ."  Based on this statute, California state prisoners who have

been sentenced to prison with the possibility of parole have a clearly established, constitutionally protected liberty interest in receipt of a parole release date. *Allen*, 482 U.S. at 377-78 (quoting *Greenholtz*, 442 U.S. at 12); *Irons v. Carey*, 505 F.3d 846, 850-51 (9th Cir. 2007) (citing *Sass v. Cal. Bd. of Prison Terms*, 461 F.3d 1123, 1128 (9th Cir. 2006)); *Biggs v. Terhune*, 334 F.3d 910, 914 (9th Cir. 2003); *McQuillion*, 306 F.3d at 903.

### 2. Scope of Due Process Protection

Additionally, as a matter of California state law, denial of parole to state inmates must be supported by at least "some evidence" demonstrating future dangerousness. *Hayward v. Marshall*, 603 F.3d 546, 562-63 (9th Cir. 2010) (en banc) (citing *In re Lawrence*, 44 Cal. 4th 1181, 82 Cal. Rptr. 3d 169, 190 P.3d 535 (2008); *In re Shaputis*, 44 Cal. 4th 1241, 82 Cal. Rptr. 3d 213, 190 P.3d 573 (2008); *In re Rosenkrantz*, 29 Cal. 4th 616, 128 Cal. Rptr. 2d 104, 59 P.3d 174 (2002)). California's "some evidence" requirement is a component of the liberty interest created by the state's parole system. *Cooke v. Solis*, 606 F.3d 1206, 1213 (9th Cir. 2010). The federal Due Process Clause requires, in turn, that California comply with its own "some evidence" requirement. *Pearson v. Muntz*, 606 F.3d 606, 609 (9th Cir. 2010) (per curiam). A reviewing court such as this one must "decide whether the California judicial decision approving the . . . decision rejecting parole was an 'unreasonable application' of the California 'some evidence' requirement, or was 'based on an unreasonable determination of the facts in light of the evidence.'" *Hayward*, 603 F.3d at 562-63 (quoting 28 U.S.C. § 2254(d)(2)).

The analysis of whether some evidence supports the denial of parole to a California state inmate is framed by the state's statutes and regulations governing parole suitability determinations. *See Irons*, 505 F.3d at 851. A reviewing court "must look to California law to determine the findings that are necessary to deem [a petitioner] unsuitable for parole, and then must review the record to determine whether the state court decision holding that these findings were supported by 'some evidence' . . . constituted an unreasonable application of the 'some evidence' principle." *Id.*

3.   California's Parole Scheme

The "ISL," or "Indeterminate Sentence Law," "refers to sections of the Penal Code and other Codes as they were operative prior to July 1, 1977." CAL. CODE REGS. tit. 15, § 2000(b)(59).  Under the ISL, which was California's pre-1977 sentencing regime, "almost all convicted felons received indeterminate terms, often with short minimums and life maximums. Within this broad range, the parole authority was given virtually unbridled statutory power to determine and redetermine, after the actual commencement of the imprisonment, what length of time, if any, such person shall be imprisoned," and when to allow those prisoners to be released on parole.  *In re Dannenberg*, 34 Cal. 4th 1061, 1088, 23 Cal. Rptr. 3d 417, 104 P.3d 783 (2005) (internal quotation marks omitted).  An "ISL Prisoner" is "[a] person sentenced to prison for a crime committed on or before June 30, 1977, who would have been sentenced pursuant to Penal Code section 1170 if he had committed the crime on or after July 1, 1977." CAL. CODE REGS. tit. 15, § 2000(b)(1); *cf.* CAL. PENAL CODE § 1170(a)(1) (declaring court should impose, with specified discretion, "*determinate sentences* fixed by statute in proportion to the seriousness of the offense as determined by the Legislature" (emphasis added)).  Currently, parole consideration criteria and guidelines for ISL prisoners are governed by title 15, sections 2315 *et seq.*, of the California Code of Regulations.

In the 1970s, California replaced its ISL system with a determinate sentencing scheme. The "DSL," or "Uniform Determinate Sentencing Act of 1976," "refers to sections of the Penal Code and other Codes as they became operative July 1, 1977." CAL. CODE REGS. tit. 15, § 2000(b)(37).  A "DSL Prisoner" is "[a] person sentenced to prison pursuant to Penal Code section 1170 for a crime committed on or after July 1, 1977." CAL. CODE REGS. tit. 15, § 2000(b)(2).  Under section 2000(b)(2), "once an ISL prisoner has received a retroactively calculated DSL release date[,] all rules applying to DSL prisoners apply to the ISL prisoner's DSL release date and parole."

Here, as stated in the previous findings and recommendations, in 1973, Petitioner "was

16

convicted of first degree murder, four counts of robbery in the first degree, assault with a deadly weapon with the intent to commit murder, and assault by means of force likely to produce great bodily injury and with a deadly weapon, each with the personal use of a firearm." *Hyde*, 2010 WL 4321606, at *12 (quoting *In re Hyde*, 154 Cal. App. 4th at 1202, 65 Cal. Rptr. 3d 162) (internal quotation marks omitted).  "The trial court sentenced [Petitioner] pursuant to the *Indeterminate Sentencing Law* to a term of life for the count 5 first degree murder." *Id.* (citation and internal quotation marks omitted).  Petitioner's "1973 convictions predate the enactment of the 1977 Determinate Sentencing Law." *Id.* (citation and internal quotation marks omitted).

Further, Petitioner never "received a retroactively calculated DSL release date." Cal. Code Regs. tit. 15, § 2000(b)(2).  The Board and Superior Court both acknowledged "[Petitioner's] minimum parole eligibility date was January 13, 1980."  Lodged Doc. 2, at 2; *see* Pet'r's Pet. Ex. K, pt. 1, at 87.  Section 2000(b)(2), which provides that "all rules applying to DSL prisoners" apply to ISL prisoners who "received a retroactively calculated DSL release date," is irrelevant here.

Rather than applying sections 2315 *et seq.*, for ISL prisoners, the Board and Superior Court considered parole suitability and unsuitability factors for "life prisoners" under title 15, section 2281 of the California Code of Regulations.  *See* Resp't's Answer Ex. 2, at 2 (Superior Court); Pet'r's Pet. Ex. K, pt. 1, at 87 (Board).  A "Life Prisoner" is "[a] prisoner serving a sentence of life with the possibility of parole." Cal. Code Regs. tit. 15, § 2000(b)(3).  The "Life Prisoner" definition lists crimes for which "[l]ife sentences may be imposed," *id.*, including (A) "[f]irst degree murder (Penal Code section 187);" and (B) "[s]econd degree murder (Penal Code section 187) *committed on or after November 8, 1978*." Cal. Code Regs. tit. 15, § 2000(b)(3)(A)-(B) (emphasis added).  Since a "Life Prisoner" includes prisoners convicted of first degree murder with no time constrictions, Petitioner, who was convicted of first degree murder, is a "Life Prisoner" under a strict interpretation of section 2000(b)(3)(A).  Parole guidelines for life prisoners under section 2281 appear to apply here.

1    But, new DSL regulations amended section 2281(c) (listing circumstances tending to

2 show unsuitability), meaning section 2281 applies to DSL, not ISL, prisoners.  *See* Cal. Admin.

3 Reg. 79, No. 26 (June 28, 1979); *see also In re Duarte*, 143 Cal. App. 3d 943, 948-49, 193 Cal.

4 Rptr. 176 (1983); *In re Seabock*, 140 Cal. App. 3d at 38-39, 189 Cal. Rptr. 310 (1983).  Sections

5 2315 *et seq.*, for ISL prisoners, rather than section 2281 under the new DSL regulations, should

6 apply here because Petitioner's 1973 convictions predate the enactment of the 1977 Determinate

7 Sentencing Law.  However, in *Connor v. Estelle*, the Ninth Circuit held that applying DSL, rather

8 than ISL, suitability criteria does not violate due process because "ISL and DSL guidelines apply

9 identical criteria in determining parole suitability."  981 F.2d 1032, 1034-35 (9th Cir. 1992)

10 (citing *In re Duarte*, 143 Cal. App. 3d at 951, 193 Cal. Rptr. 176 (1983)).  For consistency

11 purposes, section 2281 is the legal standard recited here.

12    Title 15, section 2281 of the California Code of Regulations sets forth various factors to

13 be considered by the Board in its parole suitability findings for life prisoners.  "All relevant,

14 reliable information available to the [Board] shall be considered in determining suitability for

15 parole."  CAL. CODE REGS. tit. 15, § 2281(b).  This includes:

16        [T]he circumstances of the prisoner's:  social history; past and
          present mental state; past criminal history, including involvement
17        in other criminal misconduct which is reliably documented; the
          base and other commitment offenses, including behavior before,
18        during and after the crime; past and present attitude toward the
          crime; any conditions of treatment or control, including the use of
19        special conditions under which the prisoner may safely be released
          to the community; and any other information which bears on the
20        prisoner's suitability for release.

21 *Id.*  The regulation also lists specific circumstances which tend to show suitability or unsuitability

22 for parole.  *Id.* § 2281(c)-(d).

23    Under section 2281(c)(1), factors relating to a commitment offense tend to show

24 unsuitability for parole where (A) multiple victims were attacked, injured or killed; (B) the

25 offense was carried out in a dispassionate and calculated manner, such as an execution-style

26 murder; (C) the victim was abused, defiled or mutilated; (D) the offense was carried out in a

18

manner which demonstrates an exceptionally callous disregard for human suffering; or (E) the motive for the crime is inexplicable or very trivial in relation to the offense. *Id.* § 2281(c)(1)(A)-(E).

        Other circumstances tending to indicate unsuitability include:

> (2) Previous Record of Violence.  The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

> (3) Unstable Social History.  The prisoner has a history of unstable or tumultuous relationships with others.

> (4) Sadistic Sexual Offenses.  The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.

> (5) Psychological Factors.  The prisoner has a lengthy history of severe mental problems related to the offense.

> (6) Institutional Behavior.  The prisoner has engaged in serious misconduct in prison or jail.

*Id.* § 2281(c)(2)-(6).

        Section 2281(d) sets forth circumstances tending to show suitability, which include:

> (1) No Juvenile Record.  The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.

> (2) Stable Social History.  The prisoner has experienced reasonably stable relationships with others.

> (3) Signs of Remorse.  The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or the prisoner has given indications that he understands the nature and magnitude of the offense.

> (4) Motivation for Crime.  The prisoner committed his crime as the result of significant stress in his life, especially if the stress had built over a long period of time.

> (5) Battered Woman Syndrome.  At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was the result of that victimization.

1     (6) Lack of Criminal History.  The prisoner lacks any significant
      history of violent crime.

2
      (7) Age.  The prisoner's present age reduces the probability of
3     recidivism.

4     (8) Understanding and Plans for Future.  The prisoner has made
      realistic plans for release or has developed marketable skills that
5     can be put to use upon release.

6     (9) Institutional Behavior.  Institutional activities indicate an
      enhanced ability to function within the law upon release.

7

8   *Id.* § 2281(d)(1)-(9).

9        The overriding concern is public safety and the focus is on the inmate's *current*

10  *dangerousness.  In re Lawrence*, 44 Cal. 4th at 1205, 82 Cal. Rptr. 3d 169, 190 P.3d 535.  Thus,

11  the proper articulation of the standard of review is not whether some evidence supports the stated

12  reasons for denying parole, but whether some evidence indicates that the inmate's release would

13  unreasonably endanger public safety.  *In re Shaputis*, 44 Cal. 4th at 1254, 82 Cal. Rptr. 3d 213,

14  190 P.3d 573.  There must be a rational nexus between the facts relied upon and the ultimate

15  conclusion that the prisoner continues to be a threat to public safety.  *In re Lawrence*, 44 Cal. 4th

16  at 1227, 82 Cal. Rptr. 3d 169, 190 P.3d 535.

17       C.  Analysis of Parole Denial

18            1.  Grounds One, Three and Four:  Due Process and Some Evidence

19       Here, the state court decision appropriate for review is the Superior Court's decision

20  because it is the "last reasoned state court decision."  *Delgadillo*, 527 F.3d at 925 (citations

21  omitted).  Under AEDPA's standards, the Superior Court properly held that "there is some

22  evidence" to show Petitioner's current dangerousness.  *See* Resp't's Answer Ex. 2, at 5.  The

23  Superior Court considered Petitioner's (1) commitment offenses; (2) institutional behavior; and

24  (3) 2005 psychological report.  *Id.* at 3-5.

25            a.  Commitment Offenses

26       First, the Superior Court properly noted that the Board considered Petitioner's

                                        20

1  commitment offenses, among other factors, when denying parole.  *Id.*  The Board read into the

2  record the summary of Petitioner's commitment offenses, taken from the probation officer's

3  report and the November 2006 Board Report.  Pet'r's Pet. Ex. K, pt. 1, at 95-101.

4        The Board also read Petitioner's first of two versions of the commitment offenses into the

5  record:

6              [Petitioner] accepts total responsibility for the death of the victim
               and regrets the incident occurred.  However, he claims he did not
7              enter the store in order to rob the victim, but that he was trying to
               get away from some local youths who were pursuing him.  The
8              victim startled him and he turned and fired.  He states that he never
               robbed him . . . but he did leave the premises immediately and
9              made no attempt to aid the victim.  He expresses remorse for the
               victim at this time.  As of 9/27/2006, [Petitioner] continues to
10             retain this statement as accurate.

11  *Id.* at 101-02.

12        Petitioner's counsel expressed that Petitioner believed his "commitment offense was not

13  discussed" at the September 27, 2006, hearing, and the Board "simply took that statement . . . and

14  didn't ask if [Petitioner] continued to agree with it."  *Id.* at 102, 107.  The Board asked Petitioner

15  if he agreed with this statement, to which Petitioner's counsel replied, "[Petitioner] is exercising

16  his right not to discuss the commitment offense and answering [the] question would obligate him

17  to do so."  *Id.* at 102.

18        The Board then read Petitioner's second version of the commitment offenses into the

19  record:

20             [Petitioner] stated that the previous version was partially correct,
               however that they had misinterpreted his explanation in regard to
21             how the victim was shot.  [Petitioner] stated he was holding back
               the hammer of the gun when he was startled.  The gun slipped and
22             went off.  He did not know Mrs. Lack had been shot.  He heard her
               whimper and thought she was only frightened.  He attempted to
23             pull the hammer back again because he thought this was the way
               he was supposed to handle the gun.  His hands were sweating and
24             it slipped again.  At this point Mrs. Lack was cowered in a corner.
               He did not know she had been hurt because if he had he would
25             have helped her.  He was interviewed on 9/22/2006 and he stated
               that this is still accurate as previously stated.

26

21

*Id.* at 107.  Petitioner's counsel, again, stated that the previous Board did not ask Petitioner if this statement remained accurate.  *Id.*  The Board also questioned Petitioner how he made the "leap" from "trying to make a living, working in a variety of different jobs, . . . to bringing a gun into a business."  *Id.* at 114-15.  Petitioner replied:

> Again, without attempting to blame anyone else for my actions other than myself -- peer pressure.  The influence of my friend who had done this many times and gotten away with it, who had a history of this, . . . he presented the idea.  It fit right in with my sense of hyper-independence at the time, my inflated pride that would not allow me to go back to my family and ask for help, and they would have helped me, but I was too proud to go back to them and tell them that I had failed.  I was a stubborn teenager trying to prove that I could make it on my own.  And I had rationalized at the time that okay, I'll take this money and then I'll go give it back . . . when I get a job . . . .  I told myself those sorts of stories to justify my actions.  But . . . I went and I took what I needed to pay my rent, and when I didn't have to pay rent, you know, nothing went on.  And I kept trying to convince myself that one I got a steady job, you know, this type of activity would stop.

*Id.* at 115.  The Board commented, "[O]ne would have thought that you would have had some empathy for people who run [a] business because of your own experience in working as a store clerk."  *Id.* at 114.

The record shows the Superior Court reasonably found "there were multiple victims who were attacked, injured, or killed during the offenses[;]" "the commitment offenses were carried out in a dispassionate and calculated manner[;]" and "Petitioner's motive was very trivial in relation to the offenses."  Cal. Code Regs. tit. 15, § 2281(c)(1)(A), (B), (E).  The Superior Court reasonably held that the Board weighed the nature and gravity of Petitioner's commitment offenses when denying Petitioner parole.  *Id.*; *see id.* § 2281(b).

### b.  Institutional Behavior

Second, the Superior Court noted the Board properly considered Petitioner's institutional disciplinary record when denying parole.  Resp't's Answer Ex. 2, at 4.  The Board noted that Petitioner had fourteen 115 violations," including "[m]any of which involve violence."  Pet'r's Pet. Ex. K, pt. 1, at 146-47.  The Board pointed out Petitioner had a violation "in 1991 for a

1   physical altercation and a fight;" "one for possession of an inmate manufactured weapon," which

2   the Board "considered to be associated with violence;" and "one [in] 1986 for inciting others to

3   use force or violence." *Id.* at 147.

4       The Board read into the record the offense summary for the possession of an inmate

5   manufactured weapon:

6           At approximately 11:25 a.m., [at the] California Men's Medical
        Facility, C/O . . . P. Tidwell . . . observed [Petitioner] attempting to

7           leave H-1 Housing Unit.  As Officer Tidwell proceeded toward
        [Petitioner], she observed an inmate manufactured weapon in his

8           right hand.  Officer Tidwell activated her personal emergency
        alarm, and . . . [Petitioner] was stopped on the first floor corridor.

9           Officer Greenfield talked [Petitioner] into relinquishing the
        weapon to him.  Officer Greenfield passed the weapon over to

10          Correctional Sergeant Hancock . . . .  [Petitioner] was placed in
        mechanical restraints (handcuffs) and taken to Administrative

11          Segregation.  The inmate manufactured weapon (aluminum) was
        later measured to be approximately 15 and one half inches in

12          length and one inch in width.  It was sharpened on one end[,] with
        five inches on the other end wrapped in masking tape, forming a

13          handle.  This case was referred to the district attorney's office for
        prosecution.  [Petitioner] was also found guilty at the institutional

14          level.  On 3/2/1990, he was ordered by the CSR for a 10-month
        SHU term, . . . and on 8/31/1990, endorsed for an indeterminate

15          SHU term at PBSP due to [Petitioner's] history of SHU placement
        and continual negative behavior.

16

17  *Id.* at 109.  The Board also read into the record Petitioner's version of the event:

18          [Petitioner] states he purposely displayed the weapon to draw [the]
        staff's attention to problems which were ongoing at CMF.

19

20  *Id.*  The Board commented that Petitioner was "obviously an intelligent man, and by 1989[,]

21  [Petitioner] had been in prison for a while."  *Id.* at 116.  The Board elaborated that Petitioner

22  must have known the rules and ramifications, and Petitioner's "explanation just strikes [the

23  Board] as incredible at a minimum that [he] would do something like that to draw . . . attention to

24  problems within the prison."  *Id.*

25      As discussed in depth in the previous findings and recommendation, the Board may

26  consider Petitioner's institutional history, including his conviction for an inmate manufactured

weapon, when denying parole.  *Hyde*, 2010 WL 4321606, at *15-18; *see also* CAL. CODE REGS. tit. 15, § 2281(c)(6).  The Superior Court properly found that the Board reasonably weighed Petitioner's institutional disciplinary record against Petitioner when denying parole.  *See* CAL. CODE REGS. tit. 15, § 2402(b), (c)(6).

### c. 2005 Psychological Report

Third, the Superior Court appropriately considered Petitioner's 2005 psychological report when assessing Petitioner's current dangerousness.  In Petitioner's 2005 psychological report, Dr. Patricia Miller wrote that Petitioner "continues to display difficulty acknowledging personal faults and weaknesses."  Pet'r's Pet. Ex. G, pt. 1, at 53.  Dr. Miller referred to Petitioner's "comments such as 'my thumb slipped' and 'my thumb slipped again'" to support this.  *Id.* When rendering its decision, the Board recommended that Petitioner "look at the psych reports and the Board reports [to] make a record of discrepancies and things [he] wish[es] to have clarified . . . ."  Pet'r's Pet. Ex. K, pt. 2, at 54.  The Superior Court reasonably found that the Board properly considered Petitioner's 2005 psychological report when denying parole.  CAL. CODE REGS. tit. 15, § 2281(b).

In sum, the Superior Court reasonably concluded that "some evidence" indicates Petitioner's current dangerousness.  *See* Resp't's Answer Ex. 2, at 2-6.  The Superior Court's considered Petitioner's (1) commitment offenses; (2) institutional behavior; and (3) 2005 psychological report.  *See id.*  These factors demonstrate a nexus between the facts in the record regarding Petitioner's commitment offenses and the ultimate conclusion that Petitioner still posed a risk of danger or threat to the public.  These factors also independently demonstrate some evidence in the record that Petitioner was not suitable for parole.  The Superior Court reasonably concluded that the Board's decision withstands the minimally stringent "some evidence" test and has not violated Petitioner's right to due process of law.

### 2. Grounds Two and Three:  Due Process and Matrix Argument

Petitioner argues that his imprisonment "exceed[s] the maximum time contained in the

matrix utilized in setting the term of imprisonment and violate[s] Due Process . . . ." Pet'r's Pet.
pt. 1, at 15.  California parole guidelines require setting a "base term for each life prisoner who is
found suitable for parole."  CAL. CODE REGS. tit. 15, § 2282(a).  The "base term" is "established
by utilizing the appropriate matrix of base terms" provided in title 15, section 2282 of the
California Code of Regulations.  *Id.*

To the extent Petitioner contends the Board violated state law or regulations, Petitioner is
not entitled to habeas relief.  A federal court may grant habeas corpus relief "only on the ground
that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United
States."  28 U.S.C. § 2254(a).  Mere errors in the application of state law are not cognizable on
habeas corpus.  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *see generally Langford v. Day*,
110 F.3d 1380, 1389 (9th Cir. 1996) (explaining federal petitioner may not "transform a state-law
issue into a federal one merely by asserting a violation of due process"), *cert. denied*, 522 U.S.
881 (1997).

In any event, Petitioner's claim lacks merit under state law.  Under California law, the
Board is not required to fix a base term until it finds an inmate suitable for parole.  CAL. CODE
REGS. tit. 15, § 2282(a); *see Irons v. Carey*, 505 F.3d 846, 851 n.3 (9th Cir. 2007) ("A
'determination of an individual inmate's suitability for parole under section 3041, subdivision (b)
[of the California Penal Code] must precede any effort to set a parole release date under the
uniform-term principles of section 3041, subdivision (a).'" (quoting *In re Dannenberg*, 34 Cal.
4th at 1079-80, 23 Cal. Rptr. 3d 417, 104 P.3d 783)); *In re Stanworth*, 33 Cal. 3d 176, 183, 654
P.2d 1311 (1982) ("Under both the 1976 and the current rules, a life prisoner must first be found
suitable for parole before a parole date is set."); *see also* CAL. PENAL CODE § 3041(b) (The
Board "shall set a release date unless it determines that the gravity of the current convicted
offense or offenses, or the timing and gravity of current past convicted offense or offenses, is
such that consideration of the public safety requires a more lengthy period of incarceration for
this individual, and that a parole date, therefore, cannot be fixed at this meeting."). Petitioner

was not found suitable for parole; the matrix did not need to be consulted.  Additionally,

Petitioner's claim that there was no evidence to deny him parole is unavailing.  *See supra* Part

V.C.1.  Petitioner is not entitled to habeas relief on this claim.

## VI.  CONCLUSION

For the foregoing reasons, IT IS HEREBY RECOMMENDED that Petitioner's

application for writ of habeas corpus be DENIED.

These findings and recommendations are submitted to the United States District Judge

assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within twenty-one

days after being served with these findings and recommendations, any party may file written

objections with the court and serve a copy on all parties.  Such a document should be captioned

"Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

shall be served and filed within seven days after service of the objections.  Failure to file

objections within the specified time may waive the right to appeal the District Court's order.

*Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1156-57

(9th Cir. 1991).  In any objections he elects to file, Petitioner may address whether a certificate of

appealability should be issued in the event he elects to file an appeal from the judgment in this

/case.  *See* Rule 11(a), Federal Rules Governing Section 2254 Cases (district court must issue or

deny certificate of appealability when it enters final order adverse to applicant).

DATED:        December 22, 2010.

TIMOTHY J BOMMER
UNITED STATES MAGISTRATE JUDGE